**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **MATTHEW VALENTI** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **3:07-cv-00252 (VLB)** |
| **TORRINGTON BOARD OF EDUCATION** | : | |
| **and JOHN HUDSON, in his Individual** | : | |
| **and Official Capacities,** | : | |
| **Defendants.** | : | **March 6, 2009** |

**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. #35]**

This is an action for damages brought pursuant to 42 U.S.C. § 1983 and Conn. Gen. Stat. 31-51q. The plaintiff, Matthew Valenti, a Torrington music teacher, brings this case alleging violations of his constitutional and statutory rights arising out of his speech about school matters. This case is brought against the Torrington Board of Education ("Board") and  Torrington Middle School Principal, John Hudson, in his individual and official capacities. The defendants have filed a motion for summary judgment. [Doc. #35]

Valenti alleges: 1) that his First Amendment rights were violated by retaliatory actions taken against him for exercising his right to both freedom of speech  and association; 2) that he was denied equal protection accorded under the Fourteenth Amendment; and 3) that his rights under Conn. Gen. Stat. §31-51q were violated by retaliation against exercise of protected speech. [Doc. # 1]

The Court has jurisdiction over Valenti's federal claims pursuant to 28 U.S.C.

1

§§ 1331 and 1343 and supplemental jurisdiction over Valenti's state law claim pursuant to 28 U.S.C. § 1367. For the reasons given below, the defendants' motion for summary judgment [Doc. #35] is DENIED as to Valeni's freedom of speech and association claims and GRANTED as to Valenti's equal protection claim.

<u>FACTS</u>

The examination of the depositions, affidavits, and exhibits filed in support of and in opposition to the motion for summary judgment disclosed the following undisputed material facts. Valenti was hired as a music teacher by the Torrington Board of Education in September 1978. On August 1, 2000, Valenti was elected president of the teacher's union, the Torrington Educational Association (TEA).

On June 5, 2002, Hudson was hired as principal of Torrington Middle School. Around this time, Valenti expressed opposition to Hudson's appointment to other colleagues. He wrote a letter to the Board on TEA letterhead objecting to what he characterized as a very rushed appointment process, and outlined his concerns about Hudson. Valenti was quoted in several newspapers, identified in his capacity as head of the TEA, criticizing Hudson's selection and the hiring process. Hudson read the articles in the local papers, and was advised by the superintendent that Valenti had spoken to teachers at Hudson's prior school about their negative impressions of Hudson.

Before school started, Hudson cancelled Valenti's keyboard class. He also initiated a new policy requiring music teachers to perform hall, homeroom, or enhancement duty, in addition to their other class duties, reversing the prior school

policy that teachers who taught six classes were exempt from those duties. This policy change affected Valenti and one other music teacher. Shortly after he was hired, Hudson and the superintendent authorized the installation of a second phone line and computer in Valenti's classroom at TEA expense to facilitate Valenti's union work only.

On August 26, 2002, Valenti filed a grievance on behalf of the middle school music teachers. The grievance claimed that their assignments for hall, homeroom, and enhancement duty violated their collective bargaining agreement. On October 9, 2002, a resolution was reached and then acting Superintendent Greg Riccio agreed to recognize chorus as a course, giving Valenti and the other music teacher six total courses.

On September 20, 2002, middle school assistant principal McKernan emailed Valenti about a phone call she had received from a parent whose child had received detention from Valenti. The detention was assigned on a day when there was no late bus. Valenti had a policy to hold students after school for detention when there was no late bus available. Shortly thereafter, the location of after school detention was changed from the school cafeteria to Valenti's classroom. On September 26, 2002, Valenti emailed McKernan opposing the decision. Thereafter, Valenti wrote to Hudson several times to protest this assignment, stating that he could not perform union work while students were present in the room. Hudson responded that his decision was final and that the superintendent had given him the authority to make such decisions.

On September 30, 2002, Valenti drafted and circulated a petition objecting to the disciplinary action taken against a middle school custodian. The custodian was not a member of the TEA, but Valenti stated that he was concerned that any discipline imposed on the custodian could create a precedent adverse to the members of the TEA. On October 4 and October 11, 2002, Valenti emailed both Hudson and Riccio to appeal the change of location for detention. On October 16, 2002, Valenti presented the petition objecting to the disciplinary action against the custodian to the Board. On October 19, 2002, Valenti emailed the president of the Board claiming the change in detention rooms was calculated anti-union animus.

On December 13, 2002, Valenti filed a Prohibited Practices Complaint with the Connecticut State Board of Labor Relations alleging that the Board retaliated against him for his speech on behalf of the TEA by eliminating the keyboard program, placing detention in his classroom, and not allowing him to have his chosen union representative present during an investigatory meeting.

Four days after the filing of the Prohibited Practices Complaint, Hudson directed Assistant Principal Olsen to investigate a complaint made by students in Mr. Valenti's music class that Valenti had yelled at them and was frequently engaged in other work besides teaching during class time. Olsen was instructed to interview four students at random. Valenti denied the allegations and contended the investigation was further retaliation as a result of his union activity.

The Prohibited Practices matter was settled on March 14, 2003 with Valenti stipulating there was no previous anti-union animus from the superintendent or

Hudson, and the Board agreeing to rescind a two-day suspension Hudson had given Valenti for allegedly shaking a student's desk.

In September 2003, Hudson wrote a letter directly to the faculty of the Torrington Middle School criticizing the TEA for its position against a new lesson plan instituted by Hudson, and appealing to the faculty to "let the leadership of [their] union know how you feel about taking inflexible positions such as the one I have described." [Doc. #41, Ex. 16] Hudson was then reprimanded by the Board for attempting to circumvent the collective bargaining agreement by negotiating directly with the faculty.

On March 14, 2004, Valenti was quoted in a newspaper article criticizing the school district's reimbursement of administrators' advanced degrees, including Hudson's doctorate. Throughout the summer, the *Litchfield Register Citizen* ran a series of articles about the complaints of teachers and students relating to Hudson and Riccio's hiring of Hudson. Valenti was quoted several times expressing the union's discontent with Hudson's leadership.

On October 6, 2004, Valenti, as head of the TEA, filed a grievance against Hudson relating to Hudson's proposed silent reading program. On November 9, 2004, Valenti contacted Hudson to request that the length of parent teacher conferences be reduced based on how early teachers were dismissed from work to attend those conferences. Hudson pointed out that the collective bargaining agreement did not require a minute for minute exchange and that the conferences had been the same length for several years.

5

On November 15, 2004, Hudson prohibited Valenti from missing a parent teacher conference to represent a union member in a disciplinary proceeding at a district elementary school. However, another middle school teacher, the only teacher not a member of the TEA, missed a parent teacher conference to attend a college class. This teacher and Hudson deny that any special permission given to the teacher to miss the conference, but Valenti asserts the teacher originally told him that she had. Valenti also asserts that Hudson warned him not to investigate the matter further.

On November 16, 2004, Hudson and Valenti again discussed the chorus program. Against Valenti's protests, Hudson rescheduled chorus from an in school class to an after school activity, causing enrollment to plummet. Chorus was eventually reinstated as an in school class after Valenti was suspended.

On November 18, Valenti wrote to Hudson warning him that the union would pursue a grievance against him for allowing a non-union teacher to miss conferences but not allowing Valenti to engage in union activities during the same time period.

On the next day, November 19, 2004, Hudson received a call from a parent reporting that her daughter had secondhand information that Valenti was looking at inappropriate materials on his computer during class. Hudson sought guidance from Torrington Interim Superintendent Thomas Jokubaitis. In writing a memorandum about the incident to Jokabaitis, Hudson recommended that "regardless of the outcome of the investigation, the second computer and phone line [the union

computer] should be removed from [Valenti's] classroom." [Doc. #37, Ex. III] This would allow Valenti the same computer and phone access as other teachers, which would be monitored by the school.

Jokubaitis instructed Hudson to follow up on the allegations and interview the child to establish if she or anyone else might have first hand knowledge. Hudson then interviewed three students at random, none of whom had first hand knowledge or any direct information to substantiate the allegation. Hudson determined that the allegation was without merit and recommended that the investigation be terminated.

On November 22, 2004, Hudson received a call from another parent reporting that her son saw Valenti looking at inappropriate materials on his classroom computer. Hudson spoke to the student over the phone and scheduled an interview with the student for the next morning. After receiving the phone call, Hudson reported the allegation to Jokubaitis, though he characterized it as a "kind of urban myth." [Doc. # 37, JJJ] Jokubaitis directed Hudson to confiscate both of Valenti's classroom computers. The computers were removed to the superintendent's office. The examination revealed no pornography on the school owned computer after a search of Valenti's hard drive, log of Internet usage, and email.

The student making the complaint alleged that he had seen a picture of a "mostly naked woman," which he later characterized as a "bare naked woman" and a screen showing "Google search- porno." [Doc. #37, Ex. KKK]  Based on the interview, Jokubaitis decided to investigate further. On November 23, 2004, Jokubaitis placed Valenti on paid administrative leave and directed Hudson to

investigate the matter.

Hudson submitted interview questions to both Jokubaitis and assistant principal Gary Lambour, who made changes to those questions. Assistant Principal Pam Dzurilla, who had never investigated a complaint of inappropriate conduct before, went to Valenti's music class to talk to the students. Dzurilla received a petition complaining about Valenti and what materials he looked at during class. The students signing the petition were interviewed by Dzurilla and Hudson. After being presented with a list of questions concerning inappropriate activity, several students gave written statements that they had seen pornography on Valenti's computer. They referred to the black computer as the computer Valenti was using to look at inappropriate material. The union computer was black, the school-owned computer was beige.

On November 30, 2004, district computer technician Thomas Crowley sent a report to Lambour describing his examination of the district computer used by Valenti.  He concluded that the computer had not been used to visit pornographic websites or receive pornographic emails, and that the computer contained no images of pornography.

On December 3, 2004, Jokubaitis had a meeting to discuss Valenti's suspension with two union representatives. Jokubaitis told the union representatives that if Valenti did not resign, he would be forced to investigate further and refer the matter to the police.

On December 10, 2004, the Board was informed by Valenti's union

8

representative that Valenti did not wish to resign or retire from employment. Shortly thereafter, Jokubaitis brought the allegations to the attention of the Torrington Police. On or about December 15, 2004 the Torrington Police Department reported the allegation to the Department of Children and Familes (DCF), despite school officials being designated as first reporters. Under state educational rules, a teacher or administrator who believes that there is a credible threat to a child must report that threat within 48 hours. No teacher or administrator ever reported the allegations against Valenti to DCF.

In January 2005, the middle school teachers were sent an intent to return form in order for the administration to make staffing plans. Valenti was not sent a form by the administrators, but received a form from a colleague. Valenti returned the form to the middle school and indicated his intention of teaching at the school for the upcoming school year. The next day, Channel 3 WFSB ran a lead story about Valenti's suspension. The story was then published in the local newspapers. Valenti attempted to learn who had contacted the station to report the investigation. The station would not identify the source, but characterized that person as a "school administrator." Hudson is the only school administrator involved in the investigation and suspension of Valenti who has not denied knowledge of the story, though he denied being the source.

On February 2, 2005, DCF issued a notification of its investigation finding the allegations of inappropriate activity "unsubstantiated" and closed its case.

In February 2005, Hudson received a letter from four students accusing

another teacher, Beverly Pilkington, of assaulting them and calling them names. Hudson interviewed the students but took no other action and did not report the accusations to Jokubaitis, the police, or DCF.

In June 2005, the new superintendent Susan O'Brien was informed that DCF had closed its case concerning Valenti finding that the allegations were unsubstantiated. On August 18, 2005, O'Brien was informed that the Torrington Police had closed their case because nothing inappropriate was found on Valenti's computers after forensic examination. Valenti was immediately reinstated. Valenti initially indicated that he wanted to return to Torrington Middle School, but O'Brien told him that she did not believe that he could work effectively under Hudson. Valenti was offered and accepted a transfer to an elementary school because parents and students were less likely to ask questions there, and because he did not have to work under Hudson there. Valenti's salary and benefits did not change, though he lost several private piano students. After Hudson left Torrington Middle School, Valenti applied for a district-wide position teaching strings, which he was eventually hired for.  He now teaches at every school in the Torrington school district, including Torrington Middle School.

## STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court "construe[s] the evidence in the light most

favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor."  Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2004).  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315 (2d Cir. 2006).  "The moving party bears the burden of showing that he or she is entitled to summary judgment."  Huminski, 396 F.3d at 69.  "[T]he burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002).  "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor."  Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

## DISCUSSION

### A. Claim of Vicarious Liability

The Board argues that it has no liability for Hudson's actions as the Board is not liable under the theory of *respondeat superior.* For a  municipality to have liability on a *respondeat superior* basis, its agent must have acted pursuant to "(1) an official policy or custom [that] (2)causes the plaintiff to be subjected to (3) a denial of a constitutional right." Zahara v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995). The existence of municipal policy is a question of fact. Id. *See also* Monell v.

11

<u>Department of Social Services of the City of New York</u>, 436 U.S. 658, 690-91 (1971). In the current case, there is no evidence that a written or officially adopted policy which would deny Valenti's constitutional rights existed.

However, in <u>Pembaur v. City of Cincinnati</u>, a municipality was found liable for the actions of county sheriff deputies acting pursuant to the orders of the county prosecutor. 475 U.S. 469, 106 S.Ct. 1292 (1986). The Supreme Court held that "municipal liability attaches only when the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." <u>Id.</u> at 481. Additionally, the "official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." <u>Id.</u> at 483. "Whether  an official had final policymaking authority is question of state law." <u>Id.</u>

Notice to the superintendent as the final decisionmaker and "chief executive officer" of a Board of Education, is considered notice to the Board. <u>Ritz v. Town of East Hartford</u>, 110 F.Supp.2d 94, 98. (D. Conn. 2000). The superintendent "is an agent of the Board and his actions constitute the actions of the Board of Education, unless the superintendent acts outside the scope of his authority." <u>Id.</u>, <u>citing</u> <u>Meehan v. East Lyme Bd. of Educ.</u>, No. 525063, 1994 WL 86330, *2 (Conn. Super. March 9, 1994), <u>aff'd</u>, 37 Conn.App. 922, 655 A.2d 1177 (1995)).

In this case, Hudson's actions were reported back to the acting superintendents. Valenti asked Riccio for assistance when Hudson changed the location of detentions to the music room. Riccio was also frequently copied on emails sent back and forth between Valenti and Hudson. Jokubaitis instructed

Hudson on how to investigate the student allegations against Valenti. Therefore, whenever  Hudson acted, the superintendent at the time knew of Hudson's actions, and either tacitly or explicitly approved of them. All authority for human resources actions was either delegated to Hudson or preserved to the superintendent, and all of the actions Valenti complains of were taken by Hudson or the superintendent. Accordingly, summary judgment on the ground of no vicarious liability is denied.

## B. First Amendment Claim

The Defendants argue that Valenti has not established a prima facie case of First Amendment retaliation based on free speech and freedom of association. "To establish a prima facie case of First Amendment retaliation, a plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.... Regardless of the presence of retaliatory motive, however, a defendant may be entitled to summary judgment if he can show dual motivation, i.e. that even without the improper motivation the alleged retaliatory action would have occurred." Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003). To be protected under the First Amendment, the employee's speech must "address a matter of public concern" as determined "by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1986).

Whether the speech touched a matter of public concern is to "be determined on the content, form, and context of the particular statements in question." Campbell

13

v. Windham Community Memorial Hospital, Inc, 389 F. Supp. 2d 370, 382 (D.Conn 2005) citing Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 782 (1999). Whether speech is on a matter of public concern is a question of law to be decided by the Court. Gronowski v. Spencer, 424 F.3d 285, 292 (2d Cir. 2005) In Pickering v. Board of Education of Township High School, the Supreme Court held that a teacher's letter to a newspaper about the school board's allocation of funds was a matter of public concern despite its false allegations. 391 U.S. 563, 88 S.Ct. 1731 (1968) The court found that the teacher's statements were in "no way directed towards any person with whom the appellant would normally be in contact in the course of his daily work as a teacher." Id. at 569-70. The lack of personal interest was further found as the teacher's "employment relationship with the Board ... [was] not of the kind of close relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning" Id. at 570. Furthermore, the court stated that it was "necessary to regard the teacher as the member of the general public he seeks to be," because the fact of "employment was only tangentially and insubstantially involved in the subject matter of the public communication."Id. at 574. The Pickering test is equally applicable to Valenti's freedom of association claim, though the parties do not distinguish between his conduct as constituting speech versus his conduct as constituting association. See Melzer v. Board of Ed., 336 F.3d 185 (2d Cir. 2003) (applying Pickering to freedom of association retaliation claim).

In the current case, Valenti made statements pertaining to conference policies,

detention locations, duty assignments, and disciplinary actions taken against other district employees.  These statements addressed the day-to-day functioning of the school. Thus, his employment as a teacher is not tangential to the communication. Additionally, these statements differ from those of Pickering as they deal with "matters so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts." Id. at 572. Parent teacher conferences, detentions, school duties, and disciplinary actions are largely part of the day-to-day function of the school. Since Mr. Valenti had greater access to the facts of daily school procedures  than the general public, those statements do not touch a matter of public concern.

However, Valenti's opposition to the hiring of Dr. Hudson and the questioning of his credentials are matters of public concern. While Valenti did use his union contacts to find out about Hudson's activities in other schools, these problems could be easily found in the local newspapers. That several local newspapers extensively covered Hudson's selection as principal is further evidence that the subject was a matter of public concern. Thus, as in Pickering, Hudson's credentials were a matter "of public record on which [Valenti's]  position as a teacher in the district did not qualify him to speak with any greater authority than any other taxpayer." Id.  Valenti opposed the hiring of Hudson based on his merits, and not based on his personal opinion, of which he had none at the time Hudson was hired. Valenti also questioned the expenditure of district funds on the graduate education

15

of school administrators. The expenditure of public funds is a matter of public interest. Marohnic v. Walker, 800 F.2d 613, 616 (6th Cir. 1986). Therefore, the Court concludes that much of Valenti's speech was protected by the First Amendment.

The defendants argue that Valenti's placement on paid administrative leave did not constitute an adverse employment action. "Sufficiently adverse actions include terminations, refusals to promote, demotions, reprimands, and may also encompass negative evaluations and disciplinary accusations." Clayton v. City of Middletown, 564 F.Supp.2d 105, 112 (D. Conn. 2008) "An adverse employment action is one that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Burkybile v. Bd. of Ed., 411 F.3d 306, 313-14 (2d Cir. 2005) "[T]hreat of a [disciplinary] hearing could have such a deterrent effect." Id. In the teaching context, adverse employment actions can include "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion. . . ." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) discussing Bernheim v. Litt, 79 F.3d 318, 324 (2d Cir. 1996). Valenti had detention reassigned into his classroom. He also had his courses cut back. Finally, Valenti was placed on paid leave pending investigation into the inappropriate conduct charges. Administrators put pressure on him to quit completely. During the pendency of the investigation, Valenti could not easily perform his union work, because he had no access to school grounds. Once the investigation found the claims to be unsubstantiated, Valenti was

16

reinstated as a music teacher but in a different school, because the new superintendent did not believe Valenti would be able to work with Hudson. During this period, there was a broadcast about Valenti's alleged inappropriate activities, and drawing reasonable inferences in favor of Valenti, Hudson was the source of the information. Valenti's reputation has been damaged. Accordingly, school officials will occasionally receive phone calls from parents questioning the appropriateness of him teaching their children. Additionally, the news story had an emotional effect on Valenti and his family. The news has been seen as far as Rhode Island, by friends of Valenti's elderly parents. Valenti lost some of his private piano students. The Court concludes that an individual of ordinary firmness would be dissuaded from criticizing administrators if that person knew the consequence would be the curtailing of his work, the loss of use of his classroom, a lengthy suspension, reassignment, and publication of unsubstantiated accusations to the press. Summary judgment cannot be granted on the grounds of lack of adverse employment action.

The defendants argue that the circumstances of the adverse employment action do not infer retaliation. The defendants argue there was no connection between Valenti's statements and his suspension but rather that the suspension was due to allegations made by students. Valenti must show a "causal connection . . . sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected

17

speech." <u>Morris</u>, 196 F.3d at 110.

In this case, Hudson's anti-union comments to the faculty, his insistence to Jokubaitis that Hudson's union computers be removed, and the temporal proximity between the union representative's submission of Hudson's decision to return to school and the report to police provide sufficient evidence for a reasonable jury to find that Hudson was motivated by Valenti's frequent speech against Hudson. A jury could find that Hudson was seeking a way to silence his most persistent critic, and that the student complaints were merely a pretext for seeking Valenti's removal. Both before and after Valenti's suspension, Hudson had taken no action in response to student complaints against other teachers. A reasonable jury could find that he would have taken no action against Valenti but for Valenti's speech. The Court concludes that there is a disputed issue of material fact as to whether Hudson would have made the same decisions regarding Valenti's courses, scheduling, and discipline absent Valenti's union activities and protected speech. Drawing reasonable inferences in favor of Valenti, the Court concludes that Valenti has made a prima facie case of First Amendment retaliation. Therefore, summary judgment must be denied on plaintiff's First Amendment claim.

The defendants argue that even if Valenti has established a valid prima facie case of First Amendment retaliation, his claim is time barred. "Since Congress did not enact a statute of limitations governing actions brought under §1983, the courts must borrow a statute of limitations." <u>Lounsbury v. Jeffries</u>, 25 F.3d 131, 133 (2d Cir. 1994). For §1983 actions, the statute of limitations is based on "state-law statute of

limitations for tort claims." <u>Eno Farms Co-op. Ass'n Inc., v. Corporation for Independent Living</u>, No. 3:06cv1983(AHN), 2007 WL 3308016, at \*9 (D. Conn. Nov. 13, 2007). Under Connecticut law, the appropriate statute of limitations is three years. CONN. GEN. STAT. ANN. §52-577. The time of accrual in a §1983 claim begins at the "point in time when the plaintiff knows or has reason to know of the injury which is the basis of [the] action." <u>Singleton v. City of New York</u>, 632 F.2d 185, 191 (2d Cir. 1980). Therefore, any retaliation that may have occurred within three years prior to the filing of plaintiff's February 15, 2007 complaint is actionable. The Court cannot exclude Valenti's statements made prior to February 15, 2004, as the injury is not the speech, but the response thereto.

### C. Connecticut State Law Claim

The defendants argue that the plaintiff has not established a prima facie case of retaliation under Conn.Gen.Stat. §31-51q. The Connecticut statute duplicates the First Amendment. The plaintiff "must allege that (1) he was exercising rights protected by the first amendment;" (2) there was adverse action due to the exercising of a protected right; (3) the "exercise of first amendment right did not substantially or materially interfere with [a] bona fide job performance or with his working relationship with his employer." <u>Campbell</u>, 389 F. Supp. at 381. Additionally, the court must consider whether the plaintiff "spoke as a citizen upon matters of public concern or instead as an employee upon matters only of personal interest." <u>Id.</u> at 382, citing <u>Connick v. Myers</u>, 461 U.S. 138, 147-48 (1986). Whether the speech "addresses a matter of public concern is a question of law" but the "motivation for

engaging in such speech" where the speech is disputed is a question of fact. Id. Therefore, the standard for retaliation under Connecticut law is similar to that under the First Amendment. As the Court determined that summary judgment on Valenti's First Amendment claim is inappropriate, summary judgment on Valenti's state law claim is also denied.

### D. Equal Protection Claim

The defendants challenge Valenti's equal protection claim on the grounds that a "class of one" theory of equal protection does not apply to public employees. Claims falling under the "class of one" theory have been recognized by the Supreme Court when the plaintiff is "intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). In order to succeed in a class of one claim, "the level of similarity between [the] plaintiffs and the persons with whom they compare themselves must be extremely high." Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005) (internal quotations omitted). The Supreme Court has recently held that "recognition of a class-of-one theory of equal protection in the public employment context . . . is simply contrary to the concept of at-will employment." Engquist v. Oregon Dept of Agriculture 128 S.Ct. 2146, 2156 (2008). While Valenti argues that he presents not a "class-of-one" claim but a "selective prosecution claim," the distinction seems to be nominal, rather than substantive.

> Given the Supreme Court's decision in Engquist, whether a [selective prosecution] claim in the public employment context can survive is doubtful. The Second Circuit has styled the [selective prosecution]

theory as a species of class-of-one equal protection . . . . Needless to say, the Supreme Court found that the class-of-one theory of equal protection does not apply in the public employment context. In the court's view, this would apply not only to . . .  class-of-one claims, but also to . . .  selective prosecution claims.

Spanierman v. Hughes, 576 F. Supp.2d 292, 307 (D. Conn. 2008) Therefore, since Valenti is a public employee with the school district, his class of one theory, that he was intentionally treated differently, is not available. Accordingly, the defendants' motion for summary judgment is granted on Valenti's equal protection claim.

### E. Due Process Claim

To the extent that Valenti believes he pleaded a due process claim, examination of his complaint shows that this is not the case.  The preamble to the complaint mentions the due process clause, but the substance does not. [Doc. # 1] In the preamble to his complaint, Valenti alleges that the defendants deprived him of his property interest in his job. There is no "statement of the claim showing that the pleader is entitled to relief" on the basis of deprivation of due process. Fed. R. Civ. P. 8(a)(2). Even if Valenti had expanded on his claim, it is undisputed that Valenti was never fired and his pay and benefits were unaffected by his suspension. Valenti must show some pecuniary loss, as opposed to a mere loss of reputation, to sustain a due process claim. Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155 (1976). Accordingly, to the extent Valenti argues that the defendants violated his right to due process, summary judgment is granted in favor of the defendants.

### F. Claim for Punitive Damages

The Board challenges the plaintiff's claim for punitive damages and

attorney's fees. If Valenti demonstrates that the actions taken by the Board "constituted a First Amendment violation, relief would be limited to compensatory, injunctive, and declaratory relief," as "punitive damages may not be awarded against a municipality." Morris v. Lindau, 196 F.3d 102, 112 (2d Cir. 1999). Therefore, the Valenti's claim for punitive damages and attorney's fees against the Torrington Board of Education is denied. Valenti may still seek compensatory damages from the Board. Valenti may still seek punitive damages and attorney's fees from Hudson.

### G. Qualified Immunity

Hudson argues that he is are entitled to qualified immunity. "[Q]ualified immunity...shields a government official acting in an official capacity from suit for damages under § 1983 unless the official violated clearly established rights of which an objectively reasonable official would have known." Blouin ex. rel. Estate of Pouliot v. Spitzer, 356 F.3d 348,358 (2d Cir. 2004).

"The Supreme Court has established a two-part inquiry to determine when a district court should hold that the doctrine of qualified immunity bars a suit against government officials: (1) the court must first consider whether the facts alleged, when taken in the light most favorable to the party asserting the injury, demonstrate a violation of a constitutional right, and (2) the court must then consider whether the officials' actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." Jones v. Parmley, 465 F.3d 46, 55 (2d Cir. 2006). Applying the two prong test is no longer mandatory, as the Supreme Court recently held that the lower courts "should have the discretion to decide

whether that procedure is worthwhile in particular cases." <u>Pearson v. Callahan</u>, 129 S.Ct. 808 (2009).

A defendant in an employment discrimination matter is "presumed to be aware of basic, unquestioned, constitutional rights, a presumption that can be rebutted if the defendant proves that he neither knew or should have known that his conduct would violate those rights." <u>Sagendor-Teal v. County of Rensselaer</u>, 100 F.3d. 270, 276 (2d Cir. 1996). Valenti's speech and conduct, especially his comments to the local newspapers, were likely to be protected under the First Amendment. A public employee's First Amendment rights to freedom of speech and freedom of association are fundamental and well established. <u>Munafo v. Metropolitan Transportation Authority</u>, 285 F.3d 201, 212 (2d Cir. 2002). Hudson has not made a sufficient showing to rebut the <u>Sagendor</u> presumption. Therefore, Hudson is not entitled to qualified immunity.

<u>CONCLUSION</u>

The defendants' motion for summary judgment [Doc. #35] is DENIED as to Valenti's First Amendment claim and state law claim and GRANTED as to Valenti's equal protection claim, due process claim, and claim for punitive damages and attorney's fees against the Board.

**IT IS SO ORDERED.**

_____        **/s/**

**Vanessa L. Bryant**
 **United States District Judge**

**Dated at Hartford, Connecticut:  March 6, 2009.**